UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHELLE ALARIO                                              CIVIL ACTION

VERSUS                                                       NO. 09-5440

OFFSHORE SERVICE VESSELS, LLC, ET AL.                        SECTION "L" (4)

ORDER & REASONS

Before the Court is Defendant Offshore Service Vessels, LLC's ("Offshore") Motion for Summary Judgment. (R. Doc. 47). The Court has considered the parties' briefs, as well as the applicable law and relevant facts, and is now ready to rule. For the following reasons, Offshore's Motion is GRANTED.

I.     BACKGROUND

   A.     General Facts & Procedural History

This case arises from injuries allegedly sustained while working aboard a vessel. Plaintiff Michelle Alario was hired by Offshore in April 2006 as a vessel cook. On November 26, 2007, in this capacity, Plaintiff was working aboard the C-ESCORT while the vessel was servicing the rig DEEPWATER MILLENNIUM in the Gulf of Mexico. She retired to her cabin on that day and went to bed, only to awake after a few hours. It was when she began to arise from her bed and move towards the door, that Plaintiff alleges the rocking of the vessel caused her to lose her balance, stumble across the room, and strike her right shoulder and arm on the opposite wall. Plaintiff complains of right arm, neck, and shoulder pain resulting from this incident.

On August 4, 2009, Plaintiff filed a Complaint (R. Doc. 1) alleging her injuries were

1

proximately caused by the negligence of Offshore and the unseaworthiness of the vessel. Plaintiff seeks damages for loss of past and future income, past and future medical expenses, and all maintenance and cure to which she is entitled. Offshore filed an Answer (R. Doc. 4), denying liability and raising several affirmative defenses.

On January 7, 2011, the Court issued an Order & Reasons in response to a motion for summary judgment filed by Offshore, dismissing Plaintiff's Jones Act and unseaworthiness claims, but permitting Plaintiff to pursue her maintenance and cure claims. *See* (R. Doc. 38). These remaining claims are the subject of the present Motion.

### B.     Medical Testing, Diagnosis & Treatment

Plaintiff began to receive medical treatment for her alleged injuries on December 14, 2007. *See* (R. Doc. 47-9). These injuries, for the most part, include complaints of right arm, neck, and shoulder pain. *See id.* After conservative care failed to resolve her complaints, Plaintiff underwent a right transverse carpel ligament release under the care of Dr. Jonathan Shults, an orthopedist, on April 22, 2008. *See id.* Then, on June 30, 2008, Plaintiff underwent a right lateral epicondyle release. *See id.* Plaintiff participated in physical therapy but did not report any improvement in her condition. *See id.* As a result, she was referred to Dr. Jamie Huddleston, a neurologist. *See id.*

On November 10, 2008, Dr. Huddleston recommended a cervical MRI and a repeat EMG to investigate Plaintiff's complaints. *See id.*; (R. Doc. 48-2). The MRI was conducted on December 16, 2008. *See* (R. Doc. 47-2). Based on the results, Dr. Huddleston found that Plaintiff's spine contained "no significant abnormality," except that with regard to C5-6 "[t]here is a 2.0 mm central disk osteophyte complex. The spinal canal appears patent. The right neural

foreamen appears mildly narrowed due to marginal spurring and facet hypertrophy. The left nueral foraman appears patent." *Id.* Her impression concluded, "mild right neural foraminal narrowing at C5-6, secondary to marginal spurring and facet hypertrophy. Small central disk osteophyte complex at C5-6." *Id.*

On January 9, 2009, Dr. Huddleston issued a report of EMG and nerve conduction study based upon the EMG and study performed by Dr. Shults. (R. Docs. 47-3, 48-2). Therein, Dr. Huddleston found Plaintiff's results to be normal. *See id.*

On January 26, 2009, Dr. Huddleston met with Plaintiff again. *See* (R. Doc. 47-4). Dr. Huddleston informed Plaintiff that her cervical spine issues would improve over time, she should continue physical therapy, prescribed her pain medication, and recommended she "avoid sudden lifting of any object over 30 pounds without appropriate support." *See id.*

On February 19, 2009, Plaintiff met with Dr. Shults. *See* (R. Doc. 47-5). Based on his examination of Plaintiff at that time, Dr. Shults opined Plaintiff had reached MMI and "gotten all the improvement she will from PT [physical therapy]." *Id.* He then recommended a FCT [functional capacity test]. *See id.*

On March 5, 2009, Dr. Huddleston saw Plaintiff for further evaluation of her arm and neck pain. (R. Docs. 47-6, 47-10). He remarked on Plaintiff's emotional and mental state, expressing concern that it was affecting her physical state and providing Plaintiff with counseling. *See id.* With regard to her physical state, Dr. Huddleston opined that Plaintiff's "only restrictions would be that she not lift anything over 30 pounds without assistance or without proper bracing." *See id.*

On April 16, 2009, Trevor Bardarson, P.T., OCS, sent a functional capacity evaluation

3

("FCE") report on Plaintiff to Dr. Shults.  (R. Doc. 47-7).  The FCE was conducted on April 15, 2009, and concluded Plaintiff "should be able to safely perform work based on an eight (8) hour work day...with the following restrictions: 1.) Occasional lifting of up to 20 pounds.  2.) Frequent lifting of up to 10 [pounds.]  3.) Occasional carrying of up to 20 pounds.  4.) Avoid overhead work with the right arm.  5.) Avoid repetitive motion of the right arm."  *Id.*

On August 16, 2010, Plaintiff underwent another EMG, this time conducted by Dr. Mary Mathai.  *See* (R. Doc. 47-8).  Dr. Mathai reported that, "[n]erve conduction study of the right upper extremity showed findings of moderate median entrapment neuropathy (this could be residual from her previous carpal tunnel syndrom.  Patient is status post carpal tunnel release).  Electromyogram studies of the right upper extremity showed findings consistent with acute lower cervical radiculopathy."  *Id.*

On March 17, 2011, Dr. Huddleston was deposed.  (R. Docs. 47-10, 48-2).  In her deposition, Dr. Huddleston testified that as of March 5, 2009, any further treatment of Plaintiff would be merely palliative.  *See* (R. Doc. 47-10).  Though she did suggest the possibility of Plaintiff undergoing epidural steroid injections alone or combined with physical therapy as possible means of improving Plaintiff's pain complaints.  *See id.*

On April 19, 2011, Dr. Melvin L. Parnell, Jr., an orthopedist, conducted an independent medical evaluation of Plaintiff's neck and right upper extremity.  *See* (R. Doc. 47-9).  Dr. Parnell agreed with other physicians that Plaintiff did not have a significant abnormality of the cervical spine and even if she did, it would not be related to her 2007 accident on the vessel.  *See id.*  He also agreed with Dr. Huddleston that there was no evidence of any abnormality to suggest reflex sympathetic dystrophy and recommended Plaintiff take over-the-counter nonsteroidal anti-

inflamatories on a symptomatic basis as needed. *See id.* Finally, Dr. Parnell opined that Plaintiff "should be able to return to some type of work activity provided that she work in a light duty capacity according to the results and restrictions as outlined by the functional capacity evaluation." *Id*.

## II.     PRESENT MOTION

### A.     Offshore's Motion

Offshore filed the present Motion for Summary Judgment, seeking dismissal of Plaintiff's remaining maintenance and cure claims on the basis that Plaintiff has reached maximum medical improvement ("MMI"), relieving Offshore of any further obligations. To support its argument, Offshore alleges at least two physicians have concluded Plaintiff has reached MMI and no other physician disagrees. It further alleges it has fully funded the extensive medical treatment received by Plaintiff and provided all maintenance benefits to which she is due.

### B.     Plaintiff's Response

Plaintiff filed a Response in opposition to Offshore's Motion (R. Doc. 48), arguing the testimony of Plaintiff's treating neurologist, Dr. Huddleston, demonstrates Plaintiff has not yet reached MMI. Specifically, Plaintiff alleges Dr. Huddleston has opined Plaintiff is a candidate for future epidural steroid injections and physical therapy.

### C.     Offshore's Reply

Offshore filed a Reply in further support of its Motion. (R. Doc. 51). Offshore contends, contrary to Plaintiff's characterization, Dr. Huddleston testified that any additional treatment would only be palliative in nature and future steroid injections would more probably than not be curative and only done for pain management purposes. Offshore also alleges Plaintiff's

allegations are contrary to the opinions of all other physicians.

## III. LAW & ANALYSIS

### A. Standard of Review

Summary judgment will be granted only if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed R. Civ P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Brown v. City of Houston*, 337 F.3d 539, 540-41 (5th Cir. 2003). A material fact is a fact which, under applicable law, may alter the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 271 F.3d 624, 626 (5th Cir. 2001). A dispute is genuine when a reasonable finder of fact could resolve the issue in favor of either party, based on the evidence before it. *Anderson*, 477 U.S. at 250; *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). "The moving party bears the burden of demonstrating that there exists no genuine issues of material fact." *In re Vioxx Prods. Liab. Litig.*, 501 F.Supp.2d 776, 781 (E.D. La. 2007). When considering a motion for summary judgment, the Court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 137 (5th Cir. 2004). If the party moving for summary judgment demonstrates the absence of a genuine issue of material fact "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).

Furthermore, the mere argued existence of a factual dispute does not defeat an otherwise

properly supported motion. *See Anderson*, 477 U.S. at 248. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id*. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case on which they bear the burden of proof. *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). A non-movant's conclusory allegations or bare assertions unsupported by facts are insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48.

  B. **Maintenance & Cure**

When a seaman becomes ill or injured while in the service of his ship, the shipowner must pay her maintenance and cure regardless of whether the shipowner was at fault or whether the ship was unseaworthy. *Guevara v. Mar. Overseas Corp*., 59 F.3d 1496, 1499 (5th Cir. 1995). "Maintenance" is defined as the right of a seaman to food and lodging if he falls ill or becomes injured while in the service of the vessel, whereas "cure" is the right of the seaman to necessary medical services. *Id*. It is well-settled that a determination to terminate a seaman's right to maintenance and cure must be unequivocal; payments may be terminated only when it is determined that the seaman has reached maximum medical improvement. *Johnson v. Marlin Drilling Co.*, 893 F.2d 77, 79 (5th Cir. 1990). "The cut-off date for both maintenance and cure is not the point at which the seaman recovers sufficiently to return to work." *Springborn v. Am. Commercial Barge Lines, Inc.,* 767 F.2d 89 (5th Cir. 1985). Rather, the point of maximum medical improvement has been determined to be when "it appears probable that further medical treatment will result in no betterment of the seaman's condition." *Gaspard v. Taylor Diving & Salvage Co., Inc*., 649 F.2d 372, 374 n.3 (5th Cir. 1981). Any ambiguities or doubts in the

application of maintenance and cure are to be resolved in favor of the seaman.  *Liner v. J.B. Talley & Co.*, 618 F.2d 327, 332 (5th Cir. 1980).

In the present matter, Dr. Shults expressly opined on February 19, 2009, that Plaintiff had reached MMI, noting her condition would not improve from further physical therapy.  *See* (R. Doc. 47-5).  Similarly, Dr. Huddleston had very few recommendations for Plaintiff on March 5, 2009, mostly noting Plaintiff's "mood" problem and its effect on her pain, and recommended she settle her case and return to work.  *See* (R. Doc. 47-6).  Finally, Dr. Parnell, on April 19, 2011, opined that Plaintiff did not suffer from significant abnormality of the cervical spine and recommended Plaintiff "take Nuprin, Advil, or Aleve or other over-the-counter nonsteroidal anti-inflammatory medication on a symptomatic basis as needed."  *See* (R. Doc. 47-9).  All three of these physicians, as well as Plaintiff's physical therapist, have opined that Plaintiff can return to work, albeit with lifting restrictions.  *See* (R. Docs. 47-5, 47-6, 47-7, 47-9, 47-10).

Plaintiff hinges her argument against a finding of MMI by citing Dr. Huddleston's deposition testimony.  Offshore, of course, claims this testimony supports a finding of MMI.  The particular excerpts at issue provide,

> Q. The treatment that you were recommending for [Plaintiff] at that time continued to be palliative in nature?
> A. It was not going to change the structural problems in her neck.
> -   -   -   -   -   -   -   -
> Q. Had anything changed as of [May 6, 2009] with regard to [Plaintiff], her condition or your recommendations for treatment?
> A. Looks like I said she'd continued to have pain radiating from her neck to her hand....she wasn't interested in trying any more the medications which I would be offering her.  That would probably be the end of what I would be able to offer a patient in terms of treating their neck pain.  I had suggested to her that we could send her possibly to pain management to try some injections to further improve her overall functioning and conditioning, if she wanted to.
> -   -   -   -   -   -   -   -   -   -   -
> Q. As you testified earlier, any treatment you would provide after that point would

|   |   |
|---|---|
|   | be palliative in that nature? |
| A. | Any treatment I would provide was the maximum of what I would give her. |
| Q. | Yeah. |
| A. | I was certainly not at the end of what I would provide, what could be offered to a patient like this.  She could have been sent to somebody for neck injections and, maybe, I've seen people recover with that injection, it really helped me and my pain ended.  I wouldn't be able to provide that service for her.  She was at the end of my treatment in my opinion. |
| -  -  -  -  -  -  -  -  -  -  -  - |
| A. | I certainly would offer [an epidural steroid injection] to any patient who walked in with these findings who had continued to have pain to send to someone else who does that procedure if they think she qualifies. |
| Q. | It's true it's not going to change any structural problem she has in her neck? |
| A. | No. |
| Q. | But I believe you also said that it can improve her overall function? |
| A. | Yes.  I have had some patients who did not respond to medications, have a better response to injections.  Medications in these types of disorders, medications are the first line, and the majority of people respond to conservative measures in this order, physical therapy, actually nothing, time, then physical therapy and medication trials, and then there's some people who respond to injections.  Usually they don't have to be indicated, we're talking about an epidural steroid injections.  They don't have to be indicated in the vast majority of people but there is a subset of people who do respond.  She may not but there are a small subset of people that say, it took my pain away; I'm better. |
| Q. | You have seen patients in the past that had an epidural steroid injection and their pain complaints go away? |
| A. | Uh-huh (indicating yes).  Their symptoms resolve. |
| Q. | Would it also be reasonable to combine an epidural steroid injection with a course of physical therapy? |
| A. | Of course.  Absolutely.  Sometimes I've seen people kind of get- - I don't know this will happen to this patient.  But I have seen some people get very pain free and kind of [sic] overdue their activities, so physical therapy could kind of help and make sure she's not getting in to the swing of things too much; that would be reasonable.  (R. Doc. 48-2). |

Giving the testimony a fair reading and construing any ambiguity in favor of the Plaintiff, the Court finds that the Plaintiff has reached MMI and any further treatment is merely palliative in nature.  There is at least one unequivocal pronouncement of MMI by a physician, *see Lodrigue v. Delta Towing, LLC*, 2003 WL 22999425, at *6 (E.D. La. Dec. 19, 2003)("Generally, the obligation to provide maintenance and cure ends when a doctor provides a qualified medical

opinion that plaintiff has reached MMI."); *accord Owens v. Abdon Callais Offshore, LLC,* 2011 WL 2443687, at *8 (E.D. La. June 14, 2011); *Ledet v. Smith Marine Towing Corp.,* 2011 WL 1303918, at *9 (E.D. La. Apr. 4, 2011); *Saverese v. Pearl River Navigation, LLC,* 2010 WL 3720907, at *6 (E.D. La. Sept. 14, 2010); *Brunet v. Int'l Marine, LLC,* 2010 WL 743516, at *2 (E.D. La. Feb. 23, 2010); *Commings v. Mike Hooks, Inc.*, 2008 WL 3975608, at *8 (E.D. La. Aug. 25, 2008), as well as other physician opinions suggesting Plaintiff has reach MMI. *See McGhee v. Pride Offshore, Inc.*, 2007 WL 4144955, at *3 (E.D. La. Nov. 19, 2007)(finding MMI where medical doctor has determined it is probable that further treatment will result in no betterment in the claimant's condition); *Harrison v. Diamond Offshore Drilling, Inc.*, 2008 WL 708076, at *17 (E.D. La. Mar. 6, 2008)(finding MMI where physician testified plaintiff could return to work with some physical restrictions and no further surgical treatment would better plaintiff's condition). Dr. Huddleston acknowledges Plaintiff's ongoing complaints of pain and suggests injections and physical therapy to relieve and manage this pain, but not one physician has opined that Plaintiff is suffering from a medical condition at this time which can be improved or cured. As Offshore notes, a recommendation for relief or management of pain alone does not prevent a finding of MMI. *See Pelotto v. L & N Towing Co.,* 604 F.2d 396, 400 (5th Cir. 1979)("Thus, where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been acheived."); *see also Owens,* 2011 WL 2443687, at *8 ("'Where it appears that the seaman's condition is incurable, or that further treatment will merely relieve pain and suffering, but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum medical cure has

been achieved.'"); *Ledet,* 2011 WL 1303918, at *9 (finding MMI where physician could not be bettered from a physical and functional standpoint, leaving pain as the only outstanding issue); *Commings*, 2008 WL 3975608, at *8-9 (finding MMI where physicians recommended treatment of anti-inflammatory medication, heat, and physical therapy for plaintiff's low back pain and stated any type of pain management for plaintiff's cervical spine would be palliative treatment); *Gorum v. Ensco Offshore Co.*, 2002 WL 315284460, at *5 (E.D. La. Nov. 14, 2002)("If 'future treatment will merely relieve pain and suffering,' then MMI has been reached."). Accordingly, the Court finds Plaintiff has reached MMI, alleviating Offshore of any further maintenance and cure obligations.

## IV.  CONCLUSION

For the foregoing reasons, Offshore's Motion for Summary Judgment (R. Doc. 47) is GRANTED.

New Orleans, Louisiana, this 8th day of November 2011.

_____
U.S. DISTRICT JUDGE